IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2022

## MARCUS LEVY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 13-04645    Paula L. Skahan, Judge**

_____

### No. W2021-00891-CCA-R3-PC

_____

The petitioner, Marcus Levy, appeals the denial of his petition for post-conviction relief, which petition challenged his conviction of first degree murder, alleging that he was deprived of the effective assistance of counsel. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Marcus Levy.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Shelby County Criminal Court jury convicted the petitioner of one count of first degree premeditated murder for the April 10, 2013 shooting death of the victim, Montrell Xavier Turner, and the trial court imposed a life sentence.[1] *State v. Marcus Levy*, No. W2015-01081-CCA-R3-CD, 2016 WL 3209460, at *1 (Tenn. Crim. App., Jackson, June 1, 2016). This court summarized the evidence on direct appeal:

> In the light most favorable to the State, the evidence
> shows that the [petitioner] shot the unarmed victim in the head
> from a close distance while the victim held his hands in the

_____

[1]    The petitioner was also charged with one count of employing a firearm during the commission of a dangerous felony, which charge the trial court dismissed.

air. As a possible motive for the murder, the [petitioner] admitted that he and the victim had recently experienced problems with each other, in that he believed the victim had robbed him one month prior to the murder and conducted a drive-by shooting at him the night before the murder. As evidence of the [petitioner's] intent to kill, according to one of the witnesses' statements, the [petitioner] was heard saying to his mother that he was going to shoot the victim in the face. The [petitioner's] calm demeanor immediately before the shooting further supports a finding of premeditation. The [petitioner] was seen opening his trunk and briefly pulling out an assault rifle. The victim arrived, and the defendant pointed a gun at him as he approached. The victim exited his car with his hands up in the air, and the [petitioner] shot him and then fled the scene.

*Id.*, at *8. This court affirmed the petitioner's conviction on appeal, and our supreme court denied review on September 26, 2016. *Id.*, at 1.

The petitioner filed a timely pro se petition for post-conviction relief, alleging, among other things, the ineffective assistance of trial counsel. The post-conviction court appointed counsel.[2]

At the bifurcated evidentiary hearing, Leroy Levy,[3] the petitioner's uncle, testified that he knew the victim's "whole family." At the time of the shooting, Leroy "stayed in the same house" as the petitioner. He said that when his nurse arrived, she asked him what was going on outside, at which point, he went outside to investigate and learned from family members that the victim was "down the street" "hollering and who[o]ping." He went to talk to the victim, who told him, "I'm just sick of yo nephews, man" and "I'm gone kill 'em." He said that he "begged" the victim not to leave the scene, but the victim left anyway. The victim then "came back quick" in "[n]o more than about [10] minutes" and "flew down the street, flew past me and he swerved his car." The victim then "jumped out the car" with his hand "[o]n the side of his pants." Leroy said that the victim was "reaching for something" but that he could not see what it was "because so many people surrounded the car." Leroy said that he did not see where the petitioner was when the victim got out of the car, but he saw "everybody else with guns." Leroy began "hollering, what is y'all doing. What is ya'll doing. Next thing I know, boom." He said that he saw

---

[2]      Although the post-convction court's order denying relief references an amended petition, no such petition is included in the record on appeal.
[3]      Because Leory Levy and Terence Levy share a last name, we will refer to them by their first names for clarity. We intend no disrespect.

"a whole lot of guns" but did not see who shot the victim. He also said that Terracia Harden, a neighbor from "down the street," approached the fallen victim and "reached, got the gun, [and] ran in the house." Leroy said that trial counsel never contacted him about his account of the incident.

During cross-examination, Leroy testified that for seven months leading up to and including trial, he was in the hospital for multiple medical conditions and procedures. He acknowledged that during his time in the hospital, he had a procedure that rendered him unable to speak.

Terence Levy testified that he was also the petitioner's uncle and that he lived at his mother's house with the petitioner. At the time of the shooting, Terence "was in my mother's driveway," and the petitioner's mother, Tanjular Levy, and brother, Markavius Pratcher, were "standing down the street a couple of houses down." Terence said that he also saw the victim "down the street" talking with Mr. Pratcher. He saw the victim "push[ Mr.] Pratcher out of the way" and heard him say, "'I will show you M.F. what I'm made of.'" The victim then "pulled off." "Then about five minutes later [the petitioner] pulled up." The victim then "pulled back up" and "jumped out the car" holding "a black firearm in his hand." Terence said that he saw the petitioner "shove his mama out the way" and shoot the victim. At that point, others began shooting, but Terence could not see who was shooting "[b]ecause everybody start[ed] running. Like the whole neighborhood had came down the street." Terence said that trial counsel never contacted him for his version of events.

During cross-examination, Terence acknowledged that he had prior convictions, including for being a felon in possession of a handgun, possession of marijuana, and assault. He testified that when "everybody got to shooting," he "[g]ot on out the way" but that he returned to the scene while police were present. He said that he and others "tried to talk to the police," but "[t]hey were telling us to go on back up to the house because it was so crowded outside." He acknowledged that he did not attempt to contact the police later but said, "We were waiting to talk to the lawyer." He said that he "tried to reach out to [trial counsel] to get on trial so we could testify of what happened."

On redirect examination, Terence clarified that he never spoke with trial counsel but that he did speak with counsel's investigator and assumed that the investigator would pass the information to trial counsel.

Markavius Pratcher, the petitioner's brother, testified that he was present during the shooting. He said that he "was talking to the victim in the middle of the street" and that there were other people from the neighborhood around with guns. He said that the victim asked why all the people were around and that he responded, "'Man you ain't

got nothing to do with this.'" At that point, the victim "pushed off of me and said, 'I'm fixing to go show you b**** a** n****** how to turn up,' and he jumped in the car and he drove off." He said that the victim returned approximately five to 10 minutes later, during which time, the petitioner had arrived and "was like right up the street talking to my mom." When the victim returned, "he jumped out the car with the gun" "like he was fixing to shoot my brother," and the petitioner "pushed my mama back out the way and my brother shot [the victim]." Mr. Pratcher said that the petitioner shot the victim with a handgun. After the petitioner shot the victim, Mr. Pratcher "heard multiple shots" but did not see who was shooting because "I got down low and got out of there." He said that he never spoke with trial counsel about what he had seen.

During cross-examination, Mr. Pratcher said that he did not speak to anyone, including the petitioner, about what he witnessed during the shooting, explaining, "I was nervous. I didn't really want to tell nobody."

Tanjular Levy, the petitioner's mother, testified that at the time of the shooting, she was outside at her mother's house with "my mom, my brother, and a whole lot more people were outside." She said that she saw an interaction between the victim and Mr. Pratcher, in which Mr. Pratcher "was trying to . . . ask [the victim] what was going on and [the victim] didn't want to listen. [The victim] had pushed Markavius." After the victim pushed Mr. Pratcher, the victim said "he fixing to show these -- how he going to turn up" and left the scene. At that point, "[e]verybody just was standing around." The petitioner arrived to the scene and was outside of his car talking with Ms. Levy when she saw "a car come around the corner coming down the street real fast." She saw the victim, who had been driving the car, jump out of the car "with a pistol, and that's when [the petitioner] pushed me, and that's when the shots went out." Upon hearing the gunshots, "I passed out." Ms. Levy said that she did not see the petitioner with a gun while she was talking with him but said that as the victim jumped out of his car, she saw the petitioner with a gun. Ms. Levy said that she tried to tell the police what she had seen but that they "didn't really want to talk to nobody." "They didn't want to listen to nobody. They just telling us go back in the yard." Ms. Levy could not remember whether she had told trial counsel what she witnessed.

During cross-examination, Ms. Levy said that she could not remember what specifically she had told trial counsel because "[i]t was eight years ago" and "I feared for my life" but said that she knew that she had told counsel that she had seen the victim jump out of the car with a gun. She recalled that after the victim was shot, "there was a lot of peoples around and they had tried to get the gun off him." She said that she "tried to tell [trial counsel] that" but that counsel did not bring up the issue at trial. She said that she reported what she had seen to the police in the days following the shooting and that the

-4-

police told her to get a restraining order. She acknowledged that she had three prior convictions for theft of property.

The petitioner testified that trial counsel met with him to review discovery materials and to discuss potential witnesses. He said that his "discovery pack . . . had false statements in it" and was missing certain evidence, such as crime scene photographs and "exculpatory evidence." He also said that while incarcerated pretrial, he learned things about the case from other people at the jail and that he pointed out to trial counsel that that information was not provided in discovery. He said that he gave trial counsel "a lot of stuff" that he wanted him to investigate. He said, "I told him what happened. I told him what to do, how to do it. His performance was poor. He didn't investigate my case." The petitioner said that he told counsel that "my mom, my uncles, and my brother . . . was out there [and] are like a witness to certain things." He said that he told counsel that he wanted his family members called as witnesses at trial and that he was expecting them to testify but that counsel did not call them. He asserted that had counsel called his family members as witnesses, he would have achieved a different outcome at trial.

During cross-examination, the petitioner said that trial counsel had no defense strategy. He also said that counsel could have better cross-examined the State's witnesses by eliciting testimony that the victim had robbed the petitioner, that the petitioner "squashed the beef" between them, and that the victim "came back and shot at me in front of my grandma house" 12 hours before the shooting at issue in this case. He asserted that a better cross-examination would have supported a theory of self-defense. He said that his family members were willing to testify on his behalf.

Trial counsel testified that he gave the petitioner discovery materials and said that he was "certain" he reviewed them with the petitioner because "[t]hat would have been the normal practice." Trial counsel employed an investigator who also met with the petitioner "and talked to him about his witnesses and who he felt was important and things of that nature." He said that the investigator also "met with [the petitioner's] mother and his brothers and all the people that were identified as potential witnesses." He acknowledged that Leroy and Terence were present at trial and "willing and ready to testify." He said that, at trial, the State's "fact witnesses were very reluctant to testify" and "did not want to remember what they had told the police." Because of this, the State "effectively use[d] their prior statements to the police to sort of cross-examine them, for lack of a better way of putting it, when they couldn't remember things. So it came out and the story came out from these people." Because of the witnesses' reluctance to testify, the State's case in chief took "three or four times as long as it should have taken." The petitioner and Maurice Reed testified for the defense, with their testimony concluding late on a Friday afternoon, at which point, the trial court told counsel "that the jury was done, that they'd heard everything they needed to hear and they were done."

Trial counsel said that he talked to the petitioner and told him that the jury had heard the petitioner's story and "kn[e]w everything there is to know." He explained to the petitioner that although "your family is out there prepared to reiterate" the petitioner's story, "there was some negative things about what the family" would testify to. He noted that neither Leroy nor Terence "stuck around to talk to the police" after the shooting and that their stories "weren't exactly the same thing that Maurice" and the petitioner had testified to. He was also concerned because Leroy's medical issues, which rendered him unable to "say things without a really awful, guttural, almost like he was going to throw something up in the middle of each sentence," caused "anything he was telling me" to be "painstaking." Counsel said that he explained to the petitioner that he did not think that Leroy and Terence's testimony was "going to change [the jury's] mind about anything. Either they're on our side, or they're not." The petitioner "was reluctant" and told counsel, "'I'd like my witnesses to testify,'" but ultimately deferred to counsel's advice to not call additional witnesses.

Counsel reiterated that he was prepared to call Leroy and Terence as witnesses "because they were essentially consistent with what the other witnesses have said" but expressed his concern over their credibility because "neither of them stuck around and neither of them saw [the petitioner] when he's shooting, even though they witnesse[d] a crime." He added, "[T]hat troubled me because they didn't want to admit what [the petitioner] was willing to admit: That he had shot the man in the head." Counsel said that he and the petitioner decided together not to call additional witnesses. He said that he "was really relieved that we were going to end it" because Leroy's direct testimony would have taken "at least two and a half, three hours." Trial counsel said that he spoke with Ms. Levy "many times" leading up to trial and that he and the petitioner discussed calling her as a witness. Counsel recalled, however, that Ms. Levy "did not want to be a witness because of the allegation -- even though she denied it -- that she had made some comment about they should have killed [the victim] the first time he came over here." Counsel said that if the petitioner had decided that he wanted to call the witnesses despite counsel's advice, "I would have called the witnesses and probably upset all the jurors in the process."

Trial counsel said that one of the State's witnesses testified that she saw the victim get out of his car with a cellular telephone in his hand but that the police found the victim's telephone "charging in the console of the car" and that that inconsistency was "[e]xtremely" helpful for the defense. He also said that he "made a really big deal" about the fact that one crime scene photograph that was taken "before the victim was removed from the scene" showed "something near where his body [wa]s" and that in a photograph taken after the victim's body was removed the item was "not there anymore." He said that he also emphasized the victim's having a "huge assault rifle" in the trunk of his car when he drove to the scene. Trial counsel said that his defense theory was one of self-defense.

-6-

He said that he "probably" argued for voluntary manslaughter in his closing arguments but that "the strategy was to show that this was self-defense."

During cross-examination, trial counsel said that his primary points of contact with the petitioner's family were with Mr. Pratcher and Ms. Levy. He said that Ms. Levy had told him "what she had remembered" and who "we needed to have our investigator talk to." Counsel explained part of what influenced his decision to not call Leroy and Terence as witnesses was that Mr. Reed was "a great witness for the [d]efense. He had stuck around [the scene], he gave a statement to the police, his statement in the courtroom was exactly the statement that he had given to police. It was helpful to [the petitioner]." He said that "Mr. Reed told the story as well as anybody could" and that he did not want to risk muddying the waters with more testimony, explaining, "I have had cases go sideways with a family member being the last witness." "My experience is that they want to say all of the bad things that the victim did or all the bad things that the police did but they will acknowledge nothing that their brother, sister, whoever did wrong." He said that the petitioner also "did a very credible job of telling his story as good as you can tell it under the circumstances, . . . so I was happy to end on those two witnesses." He reiterated that Leroy's testimony was "going to be painstakingly long even if the jury believed every word of it. And his story wasn't as helpful as Mr. Reed's or [the petitioner's], quite frankly."

In its written order denying post-conviction relief, the post-conviction court found that trial counsel "discussed the benefits and detriments of calling the additional witnesses with the [p]etitioner" and that counsel was concerned with the potential witnesses' credibility "and the ramifications for the [p]etitioner" if he called them.

In this timely appeal, the petitioner argues that trial counsel performed deficiently by failing to discover and call as witnesses Leroy Levy, Terence Levy, Markavius Pratcher, and Tanjular Levy. The State argues that trial counsel's decision not to call these individuals as witnesses was strategic and, alternatively, that their testimony would not have benefited the petitioner or changed the outcome of the trial.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast,

the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner is not entitled to post-conviction relief. First, the testimony of the petitioner and trial counsel established that counsel knew of all the potential witnesses and that he had his investigator interview each of them. The record does not preponderate against the post-conviction court's finding that trial counsel was concerned that the jury would not find Leroy and Terence to be credible witnesses. Generally, "the decision of what witnesses to call . . . lies within the discretion of trial counsel," *see Jeremy McMillon v. State*, No. E2020-01260-CCA-R3-PC, 2022 WL 1002410, at *14 (Tenn. Crim. App., Knoxville, Apr. 4, 2022), and, here, the record establishes that trial counsel's decision not to call these witnesses at trial was a strategic one made after adequate preparation and careful deliberation, and we will not second-guess that strategy.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE